## CONTINUATION OF APPLICATION FOR A SEARCH WARRANT

1. I, Scott Bauer, am currently employed as a Special Agent with the U.S. Department of Homeland Security (DHS), Homeland Security Investigations (HSI), and have been so employed since March of 2012. I am currently assigned to HSI Grand Rapids, MI. During my employment with HSI I have received training and conducted investigations into a wide variety of federal criminal laws, including fraud and intellectual property violations. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

2. Prior to employment with HSI, I was employed as a Special Agent with United States Department of the Interior, Office of the Inspector General, for approximately four years, where I investigated fraud, waste and abuse related to the Department of Interior. Prior to that, I was a Police Officer with the City of Casselberry, Florida, for approximately two years and eight months.

## INTRODUCTION AND PURPOSE OF THE WARRANT

3. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the installation and monitoring of a covert Global Positioning System (GPS) Tracking Device on a red colored Chevrolet Equinox bearing Michigan license plate number CDP573 and vehicle identification number 2GNALDEK6D1269327 (**Target Vehicle**). The Target Vehicle is registered to Bryan KENNERT at 3893 Werner Street, Norton Shores, MI 49444 and is

pictured below:





4. A GPS Tracking Device allows law enforcement to remotely ascertain its physical location, as well as the physical location of the vehicle to which it is attached. GPS is a highly accurate means of determining the physical location of the receiving unit at any given point in time. I have been advised that GPS is a satellite-based navigation system made up of a network of 24 satellites placed into orbit by the U.S. Department of Defense. GPS was originally intended for military applications, but in the 1980s, the government made the system available for civilian use. GPS works in any weather condition, anywhere in the world, 24 hours a day. GPS satellites transmit signals to equipment on the ground. GPS receivers passively receive satellite signals; they do not transmit. GPS receivers require an unobstructed view of the sky, so they are used only outdoors, and they often do not perform well within forested areas or near tall buildings. The Tracking Devices that will be used on the **Target Vehicle** will passively receive GPS satellite signals and, in turn, will transmit its location to law enforcement. GPS surveillance will be augmented with physical surveillance by law enforcement.

5. Based on the facts set forth in this continuation, there is probable cause to believe that violations of 18 U.S.C. §1343 have been committed, are being committed, and will be committed by KENNERT. There is also probable cause to believe that evidence and instrumentalities in violation of 18 U.S.C. §1343 have been committed, are being committed, and will be committed by KENNERT and the location of **Target Vehicle** will constitute evidence of these criminal violations by identifying additional locations where evidence may be stored.

6. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Since this continuation is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause.

## FACTUAL BACKGROUND OF INVESTIGATION

7. In December of 2020, I spoke telephonically with Mary and Andy Frisinger. The Frisingers paid KENNERT approximately $43,354 over the course of approximately six months in 2019 for what they believed were authentic, vintage baseball card packs. The packs were ultimately determined to be fraudulent (this is further detailed in a subsequent paragraph). Additionally, the Frisingers spent approximately $1,021.75 in authentication fees.

   a. The Frisingers became acquainted with KENNERT while looking for baseball cards at the Anything and Everything Antique Mall in Muskegon, MI. Andy Frisinger noticed an unoccupied booth with baseball cards for sale. As the booth was unoccupied, Andy Frisinger left a message with Anything and Everything staff inquiring about the items.

   b. Ultimately, the victims met with KENNERT on numerous occasions throughout 2019 and made several purchases of vintage baseball cards from KENNERT. These purchases were arranged via cellular telephone and occurred in the parking lot of the Anything and Everything Antique Mall.

        The purchases were facilitated via debit and credit card transactions made payable to Anything and Everything Antique Mall. During these purchases, Andy Frisinger recalled KENNERT driving a red Chevrolet Equinox.

    c.    The Frisingers described the packs they purchased as rare and had not been observed for sale for approximately 11 years. Upon receipt of some of these packs, Andy Frisinger noticed the packs appeared to be glued back together, and a Michael Jordan rookie card discovered in one of the packs was too large to fit into a standard protective case.

8.    In February of 2020, the victims met with Steve Hart from The Baseball Card Exchange to examine the cards for authenticity. Hart and The Baseball Card Exchange provide sports memorabilia authentication services and according to their website, [www.bbcexchange.com](www.bbcexchange.com), "Baseball Card Exchange is recognized as the industry leader in unopened vintage sports cards, and Steve Hart has become the most respected and trusted authenticator of unopened wax product." Hart had been studying unopened packs for 30 years and was employed by Professional Sports Authenticator, the world's largest authenticator for sports cards and sports related items. Hart had served as an expert witness at trial and had been requested to dispute hundreds of eBay/PayPal/Auction houses cases related to tampered items.

9.    The following items purchased by the Frisingers from KENNERT were reviewed by Hart and detailed in a written finding provided to the Frisingers, who in turn provided it to SA Bauer in January of 2021:

a. 1952 Topps baseball

b. (2) 1933 Goudey Sports Kings

c. 1933 Goudey baseball

d. 1936 Goudey baseball

e. (2) 1954 Bowman football

f. 1986/1987 Fleer basketball (with a Michael Jordan rookie card on the top of the pack)

g. (2) 1968 Topps Doubleheaders

h. 1955 Topps Doubleheaders

i. (2) 1963 Topps baseball 5 cent

j. (6) 1968 Topps baseball

k. (3) 1969 Topps baseball

l. (2) 1962 Topps baseball

m. (4) 1965 Topps baseball

n. 1970 Topps baseball

o. (2) 1979 Topps baseball

p. (6) 1967 Topps baseball

q. 1971 Topps baseball

r. 1972 Topps baseball

s. 1973 Topps baseball

t. (4) 1966 Topps baseball

u. (5) 1968 Topps football

      v. (2) 1965 Topps football

      w. 1961 Topps football

      x. 1966 Topps football

      y. 1967 Topps football

      z. (11) 1975 Topps football

      aa. (2) 1971 Topps football

      bb. (2) 1970 Topps football

      cc. 1974 Topps football

      dd. 1975 Topps football

10. Upon inspection of the items, Hart determined the packs had been, "Tampered with and resealed." According to Hart, the resealing was done poorly and consistently, leading him to conclude that it was done by the same person. Hart requested one of his employees review the items for a second opinion. This employee came to the same conclusion.

11. If authentic, Hart stated the value would be in the $200,000 range, however these packs were only a small fraction of that. Hart explained to the Frisingers the items were "100% complete garbage" and were "Nearly worthless."

12. According to Andy Frisinger, KENNERT stated he previously owned two sports card shops (in Ludington and Muskegon) in the 1980s, but KENNERT became burnt out and placed his products into storage. KENNERT told Andy Frisinger he had several cases of cards at his home which he hadn't reviewed yet and which he received from his father. KENNERT also stored cards in a warehouse which he shared with

another unknown individual. KENNERT stated he did not like card grading and was no longer collecting cards. Additionally, KENNERT stated he sold other types of antiquities which he received after his parent's death.

13. A review of KENNERT's criminal history revealed previous federal arrests and convictions for fraud and trafficking in counterfeit goods between 1987 and 1996. In approximately 1992, and in a previous U.S. Customs Detroit case, KENNERT plead guilty to importing counterfeit baseball cards from Hong Kong and selling them as legitimate.

14. In April of 2021, SA Bauer received information from FBI Grand Rapids regarding a 2014 investigation into KENNERT. This investigation centered around KENNERT and a box of resealed baseball cards, specifically a box of 1969 Topps baseball cards. According to FBI documents, KENNERT attempted to have the resealed cards sold at auction. Ultimately the cards were discovered to be fraudulent before they were sold.

   a. In 2014, the FBI interviewed KENNERT who admitted the packs were fraudulent. KENNERT told FBI during his time in prison he acquired the skills to obtain individual's private information, to include Social Security Numbers and credit card numbers. KENNERT also stated he utilized several PayPal and eBay accounts which could not be traced back to him and learned how to circumvent PayPal's security scrutiny.

   b. KENNERT told the FBI he worked in China in 2007 and 2008 and during that time made contacts with various counterfeiters of sports cards, coins, and US currency. KENNERT provided these individuals with advice on

quality and strategies. KENNERT stated he smuggled suitcase loads of currency from China to Hong Kong.

c. KENNERT told the FBI his business model was dealing with graded sports cards and he utilized shell companies, filed under false identities, to sell the cards. KENNERT told the FBI he made enough money in China that he did not need to work upon his return to the United States.

d. KENNERT stated he destroyed approximately one dozen 800 count boxes of raw counterfeit cards at his house prior to meeting with the FBI.

15. Through the use of law enforcement databases, SA Bauer determined KENNERT's home address was 3893 Werner Street, Norton Shores, MI 49444 (the same address provided to the FBI in 2014). The **Target Vehicle,** among other vehicles, is registered to KENNERT at the Werner Street address. A review of Norton Shores public records revealed this residence is owned by KENNERT.

a. On March 30, 2021, SA Bauer conducted surveillance at 3893 Werner Street in Norton Shores. SA Bauer observed the **Target Vehicle** parked at the residence. SA Bauer observed the **Target Vehicle** depart the residence and observed an individual matching KENNERT's description driving the vehicle.

b. On May 10, 2021, SA Bauer conducted surveillance at 3893 Werner Street in Norton Shores. SA Bauer observed the **Target Vehicle** parked at the residence.

16. I have spoken to the Frisingers, who have agreed to assist in the investigation into KENNERT. Prior to the installation of the tracker, the Frisingers have agreed to contact KENNERT and inquire about any current items available for sale. The Frisingers will request photos and/or to discuss a potential date and time to review in person whatever inventory KENNERT has available.

   a. The tracking device will allow agents to determine KENNERT's path of travel after the Frisingers contact him, inquiring about additional baseball card inventory. As KENNERT previously made statements regarding his use of additional locations to store/house sports cards, the tracker may provide evidence of those locations. Regardless of whether KENNERT travels to those locations or travels directly from his home to meet the Frisingers, his movement using the **Target Vehicle** after being contacted by the Frisingers will provide evidence of how he perpetrates his wire fraud, in violation of 18 U.S.C. § 1343.

17. To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the court authorize installation, maintenance, and removal of the tracking device during both daytime and nighttime hours. Based on my observations, I believe the **Target Vehicle** is presently within the Western District of Michigan.

18. In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period not to exceed 45 days following issuance of the warrant. The tracking device may

produce signals from inside private garages or other such locations not open to the public or visual surveillance.

## AUTHORIZATION REQUEST

19. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes members of the Department of Homeland Security/Homeland Security Investigations or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device on the **Target Vehicle** within the Western District of Michigan within 10 days of the issuance of the proposed warrant, to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the **Target Vehicle** after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the Western District of Michigan.

20. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 90 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by

prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.  Also, due to the length of the investigation, and the time and resources put into obtaining information relevant to the investigation such as the amount of financial information, a 90-day delay in notification is requested.